# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

JAMES BROADNAX,

                Plaintiff,

                v.

MELISSA ELLIOTT, NURSE FERNANDEZ, OFFICER FISHER, OFFICER LHASOYA, KAREN HOOGENDORN, SAMANTHA HORN, JONI SCHAEFFER, NITA NEYLAND, JAMAR BEY, ERNESTINE JULYE, PAUL REILLEY, SUZANNE FULTS and ALBERT PERKINS in their individual capacities, and UTMB CORRECTIONAL MANAGED CARE.

                Defendants.

Case No. 24-3132

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONEY DAMAGES

Plaintiff James Broadnax, by his attorneys, respectfully alleges:

### PRELIMINARY STATEMENT

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for injuries suffered by Plaintiff James Broadnax as a result of the deliberate indifference to his safety and health, and negligence exhibited by officials and employees acting under color of state law at the Allan B. Polunsky Unit operated by the Texas Department of Criminal Justice.

2. Plaintiff is and has been incarcerated at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas and at all relevant times was under the care of Defendant UTMB Correctional Managed Care ("CMC").

3. On September 13, 2023, Plaintiff began to suffer sharp, sudden chest pain above his sternum, which instantly spread to the right side of his chest. Plaintiff was visibly short of breath, wheezing, and gasping. Plaintiff became unable to stand, and was forced to remain doubled over in his cell. He noticed his hands were quickly losing color and that he was becoming extremely pale.

4. Plaintiff immediately alerted a nurse to his condition, and over the next seven days repeatedly made oral and written requests for medical treatment. These requests were ignored and denied, and Plaintiff suffered—in severe pain and unable to breathe—for a week. After finally receiving a medical exam on September 20, 2023, he was rushed to the hospital and diagnosed with a collapsed lung, which required surgical intervention and a week-long hospital stay.

5. After returning to the Polunsky Unit from the hospital, prison officials removed his surgical sutures—over his objections—too early, and he suffered for several weeks with an open wound. He was again denied proper medical treatment and suffered additional pain for several more weeks.

6. Because of Defendants' actions, Plaintiff suffered deprivations of the rights, privileges and immunities guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution. He brings this lawsuit under 42 U.S.C. § 1983 and Texas state law to recover damages and other relief to compensate him for the injuries he has suffered, and prevent further violations of his constitutional rights.

**JURISDICTION**

7. This action is brought pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the U.S. Constitution.

2

8. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

9. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state law claims that are so related to the federal claims that form part of the same case or controversy.

## VENUE

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to these claims occurred in the Southern District of Texas.

## PARTIES

11. Plaintiff James Broadnax was at all relevant times detained at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  He is domiciled in the state of Texas.

12. Defendant CMC is a healthcare entity that oversees and provides healthcare services to individuals imprisoned in the Polunsky Unit.  CMC establishes and supervises the medical treatment of incarcerated persons, and overall healthcare operations in coordination with the Polunsky Unit.  CMC is further responsible for the implementation of policies, procedures, and customs, as well as the acts and omissions of its employees based on the training and discipline of each employee.

13. Defendant Nurse Fernandez was at all relevant times employed with Defendant CMC and operates at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

3

14. Defendant Officer Fisher was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

15. Defendant Officer Lhasoya was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

16. Defendant Nurse Karen Hoogendorn was at all relevant times employed with Defendant CMC and operates at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

17. Defendant Nurse Melissa Elliott was at all relevant times employed with Defendant CMC and operates at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

18. Defendant Doctor Ernestine Julye was at all relevant times employed with Defendant CMC and operates at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

19. Defendant Physician Assistant Paul Reilley was at all relevant times employed with Defendant CMC and operates at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, he is domiciled in the state of Texas.

20. Defendant Sergeant Joni Schaeffer was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas.  On information and belief, she is domiciled in the state of Texas.

21. Defendant Lieutenant Samantha Horn was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas. On information and belief, she is domiciled in the state of Texas.

22. Defendant Major Nita Neyland was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas. On information and belief, she is domiciled in the state of Texas.

23. Defendant Sergeant Jamar Bey was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas. On information and belief, he is domiciled in the state of Texas.

24. Defendant Officer Suzanne Fults was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas. On information and belief, she is domiciled in the state of Texas.

25. Defendant Officer Albert Perkins was at all relevant times employed at the Allan B. Polunsky Unit in West Livingston, Polk County, Texas. On information and belief, he is domiciled in the state of Texas.

**FACTS**

**A. Plaintiff Is Denied Urgent Medical Care**

26. On September 13, 2023, Plaintiff began to suffer sharp, sudden chest pain above his sternum, which instantly spread to the right side of his chest. Plaintiff was visibly short of breath, wheezing, and gasping. Plaintiff became unable to stand, and was forced to

5

remain doubled over in his cell.  He noticed his hands were quickly losing color and that he was becoming extremely pale.

27. Plaintiff stood by the door of his cell waiting for Officer Fisher to pass by.  When she appeared, Plaintiff alerted her to his condition and asked her to send a nurse.  Officer Fisher said she would send a nurse and gave Plaintiff three "sick call" forms, which is the Texas Department of Criminal Justice's process by which an incarcerated individual requests to be seen by a health care professional for medical treatment.

28. Plaintiff filled out one sick call describing his condition and gave it to Officer Fisher. Officer Fisher said she would relay the sick call to a nurse.

29. That night, Plaintiff alerted Nurse Fernandez, who was passing by his cell, of his condition.  Nurse Fernandez responded that she would return to check on Plaintiff, but never did.

30. On September 15, 2023, Plaintiff again informed Nurse Fernandez of his symptoms and told her of his pain and difficulty breathing.  Plaintiff realized he could only say a few words at a time, and was speaking through labored breath.  Plaintiff then submitted a second sick call.

31. On September 16, 2023, Plaintiff again spoke to Nurse Fernandez and reiterated his urgent need for help.  He explained that his pain had increased overnight and that he was hardly breathing.  Nurse Fernandez responded that she understood and promised to pass along the information.

32. The Polunsky Unit's Nursing Protocol specifically mandates that a nurse initiate urgent care in instances where an inmate experiences "crushing or extremely severe pain," "chest pain lasting more than a few minutes," or "shortness of breath."[1]

33. Despite Nurse Fernandez's promises, Plaintiff's requests were repeatedly ignored, which led him to submit two additional "sick call" requests for urgent medical care.  Each time he submitted these requests, nursing staff told Plaintiff that they had not heard of his previous requests.  Both additional requests were also ignored.

34. Plaintiff's pain became increasingly worse.  Plaintiff could barely speak, and felt a stabbing pain every time he coughed, leading him to think he "was going to die in [his] cell."

35. On September 19, 2023, Plaintiff spoke to Officer Montoya, who immediately notified Sergeant Schaeffer and Lieutenant Horn about Plaintiff's condition and requested he receive urgent medical attention.  Despite Officer Montoya's efforts, Plaintiff's needs were again ignored, and his condition continued to worsen.

36. On September 20, 2023, Officer Montoya asked Sergeant Schaffer and Lieutenant Horn if other officials or employees had checked on Plaintiff.  Sergeant Schaeffer and Lieutenant Horn told her they had not, specifically stating that they "did not think it was significant enough" of a medical issue to do so.

37. Recognizing the severity of Plaintiff's condition, Officer Montoya took it upon herself to ensure Plaintiff was seen by medical staff, and rushed him to the Polunsky Unit's medical wing.

---

[1] *See* Ex. A (Nursing Protocol for Upper Respiratory Symptoms) at 1-2.

38. At the medical wing, Plaintiff's vitals were taken and he underwent two X-Rays. Plaintiff learned that his sick calls had never been submitted to medical staff by Officer Fisher or otherwise.

39. Upon viewing the X-Ray of Plaintiff's chest, medical staff immediately determined that Plaintiff's lung had collapsed, and noted that he was "unable to take deep breath[s] at this time,"[2] and exhibited a "deep barking cough" that remained "persistent for 6 days."[3]

40. Plaintiff was then rushed to St. Luke's Health-Memorial Hospital in Livingston, Texas.[4]

41. Major Neyland, Lieutenant Horn, Sergeant Schaeffer, Sergeant Bey, Doctor Julye, and Physician Assistant Paul Reilley continued to place Plaintiff's life in danger by failing to transport him to the hospital in an emergency medical vehicle, as is policy and normal procedure. Instead, Plaintiff was shackled in a stress position—further compressing his lung—and forced into a transport vehicle. Because the transport vehicle did not have a seatbelt or seats, Plaintiff was thrown across the car while shackled in the stress position on the way to the hospital.

42. Officer Fults and Officer Perkins then forced Plaintiff to walk through the Emergency Room entrance to the hospital, despite orders to have Plaintiff in a wheelchair. Upon entering the hospital, medical professionals immediately reprimanded the officers for refusing to transport Plaintiff in a safe manner, exacerbating his condition, and further endangering Plaintiff.

43. Defendants lack any medical or other justification for denying Plaintiff treatment despite his obvious pain and inability to breathe.

---

[2] *See* Ex. A (Nursing Protocol for Upper Respiratory Symptoms) at 4.
[3] *See* Ex. B (Sept. 20, 2023 Clinic Note) at 1.
[4] *See* Ex. C (Transfer to Hospital/ Emergency Room Form) at 1; Ex. A (Nursing Protocol for Upper Respiratory Symptoms) at 4 ("Send to ER by Unit Van").

44. As a result of not receiving urgent medical care, Plaintiff's condition deteriorated quickly, exacerbating his inability to breathe, causing him severe chest pain, sudden and intense shortness of breath, falling oxygen levels in his blood, dangerous pressure on his heart, and sharp pain on his affected side.  Through their actions, Defendants created a grave threat to Plaintiff's life.

45. After arriving at St. Luke's Health-Memorial Hospital in Livingston, Texas, Plaintiff immediately underwent emergency surgery to repair his lung.

46. On September 21, 2023, Plaintiff was transferred to HCA Houston Healthcare Hospital in Conroe, Texas to begin his recovery.

47. Plaintiff was treated at HCA Houston Healthcare Hospital from September 21, 2023 through September 28, 2023.  For the first five days of his treatment, Plaintiff required a mechanical ventilator to breathe.  Plaintiff remained on strict bedrest orders for the entirety of his stay.

## B.  Plaintiff Is Unjustly Denied His Grievance

48. After returning to the Polunsky Unit, Plaintiff began collecting the information required to file a grievance against prison staff.  This included gathering officer names and reading officer manuals.

49. On October 4, 2023—only five days after returning to the Polunsky Unit from the hospital—Plaintiff submitted an Offender Grievance Form to the Texas Department of Criminal Justice regarding the events described above.[5]

50. The Grievance was denied as purportedly untimely "because the dates [listed on the form] were September 13, September 15, September 16, and September 19," and thus the

---

[5] *See* Ex. D (Offender Grievance Form Step 1) at 1.

required 15-day limitations period had passed.[6]  This denial ignored the fact that Plaintiff had been hospitalized for much of the period at issue, and was unable to prepare and file a grievance while in the hospital, breathing with the assistance of a chest tube.[7]

51. This denial also ignored Plaintiff's September 20, 2023 visit with prison medical staff, which led him to be immediately rushed to the hospital.  In fact, Plaintiff promptly filed the grievance upon his return to the Polunsky Unit.

52. On October 10, 2023, Plaintiff filed an appeal of his Offender Grievance Form to the Texas Department of Criminal Justice.[8]  Plaintiff's appeal was ultimately denied.

## C. Plaintiff Is Again Denied Proper Medical Care

53. On October 4, 2023, upon returning from the hospital, Plaintiff met with Physician Assistant Reilley to discuss the removal of his stitches.  Physician Assistant Reilly did not examine him or make any attempt to assess the condition of his wound.

54. Physician Assistant Reilley told Plaintiff that he planned to remove Plaintiff's stitches on October 7, three days later.  Plaintiff expressed his concerns to Physician Assistant Reilley that it was too early to remove his stitches because his wound had not yet healed and was still causing him severe pain.  Physician Assistant Reilley dismissed his concerns as insignificant.

55. The next day, October 7, 2023—although drastically premature—Physician Assistant Reilley insisted on having Plaintiff's stitches removed, and ordered Nurse Elliott to remove them. This caused an open wound on Plaintiff's chest that was both painful and created a risk of infection.

---

[6] *See* Ex. E (I-60 Request) at 1.
[7] *See* Ex. H (Return from Medical Appointment Form) at 1.
[8] *See* Ex. F (Offender Grievance Form Step 2) at 1-2.

56. On October 9, 2023, Plaintiff met with Dr. Julye for a post-surgery follow-up appointment.  Dr. Julye expressed surprise that "[Plaintiff's] wound was open" and asked Plaintiff what had happened.  Dr. Julye saw that Plaintiff's wound was irritated and raw, and immediately prescribed a two-week treatment plan.  Plaintiff then asked Dr. Julye for access to a clean, medical shower to help treat his wound.  Dr. Julye promised to relay the message.

57. On October 11, 2023, Plaintiff met with Nurse Charvat and Nurse Hoogendorn.  Both nurses noted that his wound was open and expressed deep concern.  They also relayed that the wound could not be restitched and that it placed Plaintiff at a risk for a major infection.  Plaintiff then asked Nurse Charvat and Nurse Hoogendorn for access to the medical shower.  Both reiterated that they would check with Physician Assistant Reilley first.[9]

58. On October 11, 2023, Nurse Hoogendorn explained that Physician Assistant Reilley denied the request, stating that Plaintiff's situation "did not qualify."[10]

59. Nurse Hoogendorn apologetically explained that she did not agree with this assessment but that her hands were tied because of Physician Assistant Reilley's order.

60. On October 12, 2023, Plaintiff sent a letter request to Dr. Julye reiterating his request for a clean, medical shower.[11]  Plaintiff never received a response to this letter request.

61. Despite the severe risk of infection Plaintiff already faced, Plaintiff was subsequently forced to shower with an inmate who has a well-documented and advanced case of

---

[9] Ex. G (Letter from James Broadnax to Dr. Julye) at 1 ("As you know, P. Reilley ordered the removal of my stitches too soon, and as a result, I have an open wound on my side that places me at risk for infection.  Nurse Hoogendorn emailed [Physician Assistant Reilley], and told me that she also spoke to him directly about this.").
[10] *Id.*
[11] *Id.*

MRSA[12] (Methicillin-Resistant Staph Aureus) infection.  These infections are highly contagious and can be fatal.  This action put Plaintiff at additional risk of serious infection.

62. As a result of Defendants' deliberate indifference and neglect, Plaintiff suffered additional pain, endured an unnecessarily extended healing process, and faced a severe risk of infection to the wound created by Defendant Reilley.  Plaintiff's fragile health and life was put at an even greater risk than if his injuries had been treated properly.

**D.  Defendant CMC's Contract with TDCJ Incentivizes Inadequate Care and Deprivations of Constitutional Rights**

63. The Defendants' deliberate and wanton indifference to Mr. Broadnax's basic medical needs is a result of Defendant CMC's written policies, set forth in the contract between Defendant CMC and the Texas Department of Criminal Justice (the "Contract").

64. The Contract codifies requirements that Defendant CMC must follow when it provides healthcare to incarcerated individuals, such as Mr. Broadnax, and sets forth standards governing Defendant CMC's treatment of incarcerated persons.

65. Defendant CMC's obligations and requirements under the Contract have led to practices that significantly deviate from Defendant CMC's lawful duties to provide adequate medical care to all the incarcerated persons under its care.

66. In fact, the Contract rewards Defendant CMC when its employees deliberately ignore, delay, or deny medical treatment to incarcerated persons under their care because it encourages all grievances related to CMC's medical care to be resolved against the incarcerated person.

---

[12] *Id.*

67. Specifically, Defendant CMC is contractually obligated to resolve at least 90% of Step I medical grievances brought by an incarcerated person against CMC's employees and prison officials in favor of its employees or prison officials and against the incarcerated person.[13]

68. Defendant CMC is further contractually obligated to resolve at least 94% of Step II medical grievances brought by an incarcerated person against CMC's employees and prison officials in favor of its employees or prison officials and against the incarcerated person.[14]

69. These specific and written contractual obligations encourage Defendant CMC's employees to resolve substantial and legitimate incarcerated person grievances in favor of its employees or prison officials rather than incarcerated persons, and avoid subjecting Defendant CMC's employees to disciplinary action or penalties when they fail to provide appropriate medical care.

70. The resulting effects of these contractual obligations are that valid, serious, and substantial complaints, such as Mr. Broadnax's complaints, are deliberately ignored and dismissed.

71. In addition, the Contract allows for Defendant CMC to routinely ignore or dismiss the sick call slips submitted by incarcerated persons, thereby failing Defendant CMC's duty to provide adequate and timely access to care.

---

[13] See Ex. I (Contract between TDCJ and CMC) at 30.
[14] *Id.*

13

72. Under the Contact, Defendant CMC is obligated to respond to incarcerated persons' sick call slips ONLY 80% of the time, and Defendant CMC's employees can therefore ignore 20% of sick call slips without penalty, additional monitoring, or corrective action.[15]

73. As a result of these contractual provisions, Defendant CMC's employees, including Defendants Elliott, Fernandez, Julye, Reilley, and Hoogendorn, were able to ignore and dismiss Mr. Broadnax's four sick-call slips without any issue or penalty. Nor was there any recourse available to Mr. Broadnax.

74. Because of Defendants' actions, Plaintiff suffered deprivations of the rights, privileges, and immunities guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution.

**E. Defendant CMC's Unlawful Customs or Practices Towards Medical Treatment**

75. Defendants' deliberate and wanton indifference to Mr. Broadnax's basic human medical needs was also a result of Defendant CMC's custom or practice to deny medical treatment, delay medical treatment, or ignore medical needs and emergencies of incarcerated persons under its care.

76. Publicly available information from the Correctional Managed Health Care Committee (CMHCC) reveals that incidents similar to Mr. Broadnax's, involving the denial, delay, or wanton indifference to the medical needs of incarcerated individuals, are frequent and common occurrences within Defendant CMC's operations.[16]

---

[15] *Id.* at 29.

[16] The Correctional Managed Health Care Committee is a Texas governmental office that coordinates the healthcare partnership between the TDCJ and Defendant CMC. It is a separate and unique entity from Defendant CMC.

77. Based on publicly available information, there have been **119,372** combined Level II medical grievances and Patient Liaison Program (PLP) complaints received from 2017 to 2023.[17]

78. A PLP complaint is separate from an incarcerated persons internal grievance and arises when a third-party (i.e., attorney, family member, government official, etc.) requests an investigation regarding an incarcerated persons' access to health care and/or quality of health care.

79. Notably, the recorded **119,372** complaints from 2017 to 2023 do not account for Level I grievances.  Therefore, upon information and belief, the actual number of complaints in this time period is significantly more numerous.  This conclusion is supported by the fact that Defendant CMC's contractual obligations encourage its employees to consistently dismiss incarcerated persons' complaints at the Level I stage.[18]

80. Only **6,277** of these complaints were sustained and led to an Action Request.  An Action Request is generated to address significant healthcare issues such as Defendant CMC's clinical decisions, complaints about medical personnel, and/or sufficient access to healthcare.

---

[17] Data is compiled from quarterly CMHCC meetings.  Publicly available agendas for these quarterly meetings contain statistics on PLP Complaints and Level II Grievances, including how many are filed and responded to, and how many are escalated into Action Requests.  *See generally* Texas Department of Criminal Justice, *Correctional Managed Health Care Committee (CMHCC): Corresponding Agendas and Minutes*, https://www.tdcj.texas.gov/divisions/cmhc/committee_meetings.html.  The true number of total grievances is likely greater than this reported number, because there was no meeting—and thus no reported statistics—for Q1 2020, likely because of COVID.  *See id.*
[18] *See* Paragraphs 63 to 75.

81. Notably, from 2017 to 2023, Defendant CMC sustained Step II grievances at approximately a rate of **4.75**%[19]—even less than the 6% required under the contract with TDCJ.[20]  CMHCC kept close track of whether Defendant CMC remained under the required 6% figure; each quarter, CMHCC publicly reported Defendant CMC's rate of sustained grievances in the agendas for its regular meetings, comparing Defendant CMC's figure to the 6% target.  In its Fourth Quarter 2023 agenda, for example, CMHCC disclosed that the "percentage of sustained Step II medical grievances from UTMB was 5%," while "[p]erformance measure expectation is 6% or less."[21]  Upon information and belief, these figures are the result of Defendant CMC employees ignoring legitimate grievances from incarcerated persons in their care.

82. In addition to the facts set forth above, there is additional evidence of Defendant CMC's unconstitutional policies and practices.  Further evidence of this custom or practice arises from a litany of specific and severe publicly known incidents involving the deprivation of incarcerated persons' constitutional right to healthcare while under the care of Defendant CMC.

---

[19] This figure is again drawn from CMHCC's public quarterly meeting agendas.  Each quarter from 2017 to 2023, CMHCC reported Defendant CMC's rate.  *See generally Correctional Managed Health Care Committee (CMHCC): Corresponding Agendas and Minutes*, *supra*.  The average of these 27 figures (eight years, four reports per year, except for Q1 2020) is 4.7474%.  *Id.*  This average approximates Defendant CMC's rate of sustained Step II grievances from 2017 to 2023.

[20] *See* Paragraphs 63 to 75.

[21] Texas Department of Criminal Justice, *Correctional Managed Health Care Committee Meeting Agenda:4th Quarter of 2023*, at 87 (December 13, 2023), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhcc_meetings/2023-12-13_CMHCC_Agenda.pdf.

83. Many of these incidents are detailed in a 2011 report by the Texas Civil Rights Project.[22] In one incident, an inmate spent over six months without a hip joint after his hip replacement was removed because Defendant CMC's employees continually cancelled or pushed back his medical appointments without cause or medical justification.[23]

84. In a separate incident described in the report, an incarcerated man under the care of Defendant CMC complained about going blind for nearly a month before he was seen by any medical professional. Eventually, he met with a doctor for less than three minutes, who concluded that the inmate needed psychotropic drugs rather than treatment for his eye. This was a complete misdiagnosis, which left the inmate completely blind in his left eye.[24]

85. In another incident, an incarcerated man died at age thirty-four while under the care of Defendant CMC. The man collapsed on the floor while taking a shower and was promptly evaluated by a nurse employed by Defendant CMC. The nurse failed to enter the showers and decided to instead evaluate the situation through a tray slot on the shower door. The nurse declared that no healthcare issue was present because the man was faking the episode. Medical staff waited two hours to enter. Ten minutes after they entered, the man was declared dead. An autopsy later revealed that the denial of medical treatment led him to essentially be boiled alive due to a two-hour long exposure to water temperatures more than 150 degrees Fahrenheit that devastated his internal organs and caused heart failure.[25]

---

[22] *See generally* Ex. J (Texas Civil Rights Project, *"A Thin Line": the Texas Prison Healthcare Crisis and the Secret Death Penalty* (2011)).
[23] *Id.* at 21.
[24] *Id.* at 18-19.
[25] *Id.* at 3.

86. In another incident, an incarcerated man developed a severe staph infection on his ankle and was taken to Defendant CMC's facilities in Galveston where doctors ordered that his wound be cleaned twice *daily*. Once he returned to prison, Defendant CMC's staff only cleaned his wound twice *weekly*. Due to such deliberate denials of adequate healthcare, this man's infection worsened and, ultimately, he had to have his foot amputated above the ankle.[26]

87. Since the Texas Civil Rights Project report was published in 2011, there have been numerous more incidents litigated in federal court that demonstrate that Defendant CMC's custom or practice to deny medical treatment and needs has continued unabated.

88. In one case arising in July 2019, TDCJ inmate Austin Birdow bit off his tongue while playing basketball. After enduring three days of constant pain in which he lost seven pounds from not eating, Mr. Birdow was seen by a doctor employed by Defendant CMC. The doctor refused to physically examine Mr. Birdow and prescribed him a minor dose of ibuprofen. As a result, Mr. Birdow developed a disease and a cauliflower-like growth on his tongue.[27]

89. In March 2022, TDJC inmate Jewell Thomas brought suit because he suffered from medical conditions—including diabetes, hypertension, and schizoaffective disorder—which made him susceptible to various ailments during exposure to excessive heat. Mr. Thomas was regularly subjected to heat of over 100 degrees in his cell where he was housed, which led him to suffer dehydration, chest pain, shortness of breath, heat cramps,

---

[26] *Id.* at 20.

[27] *Birdow* v. *Chapa*, 2021 WL 7184961, at *1, 3, 5-6 (S.D. Tex. Oct. 5, 2021), *report and recommendation adopted*, 2022 WL 263471 (S.D. Tex. Jan. 28, 2022) (denying motion to dismiss deliberate indifference claim against CMC employee).

hallucinations, and hearing voices.  Mr. Thomas submitted multiple sick call requests to be housed in an air-conditioned area—like other inmates with similar issues—but was effectively ignored by Defendant CMC's employees.[28]

90. These specific descriptions of incidents similar to Mr. Broadnax's, which all occurred before his, are only a few of the thousands of incarcerated persons affected by Defendant CMC's custom or practice to deny medical treatment, delay medical treatment, or to ignore medical needs and emergencies of incarcerated persons under its care.

91. Ultimately, this widespread custom or practice of Defendant CMC created the conditions for Defendants Nurse Fernandez, Officer Fisher, Officer Lhasoya, Nurse Hoogendorn, Nurse Elliott, Doctor Julye, Physician Assistant Reilley, Sergeant Schaeffer, Lieutenant Horn, Major Neyland, Sergeant Bey, Officer Fults, and Officer Perkins to wantonly deny Mr. Broadnax medical treatment for his serious medical conditions, and led to the deprivation of Mr. Broadnax's constitutional right to be free from cruel and unusual punishment and the right to medical care, thereby causing Mr. Broadnax's injury.

## FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983—Violation of Mr. Broadnax's Right to Substantive Due Process Against Defendants Elliott, Fernandez, Fisher, Lhasoya, Hoogendorn, Horn, Schaeffer, Neyland, Bey, Julye, Reilley, Fults, and Perkins (the "Individual Defendants")**

92. Plaintiff repeats and realleges as is fully set forth herein the allegations contained in the foregoing paragraphs.

93. The Individual Defendants at all relevant times acted under color of Texas State law.  By their actions, the Individual Defendants denied Plaintiff needed treatment and held him in

---

[28] *Thomas* v. *Sanchez*, 2022 WL 19826865, at \*6-7 (S.D. Tex. Oct. 31, 2022*), report and recommendation adopted*, 2023 WL 3392002 (S.D. Tex. May 10, 2023) (denying motion to dismiss deliberate indifference claim against CMC employee).

conditions that exacerbated his urgent need for medical care and prevented him from seeking necessary treatment.  The Individual Defendants knowingly, recklessly, or with deliberate indifference subjected Mr. Broadnax to the obvious and foreseeable risk that he would suffer serious bodily harm or even death.

94. By denying and preventing Plaintiff from receiving the urgent medical care he needed, the conduct of the Individual Defendants shocked the conscience and violated professional norms, established medical standards, and several Texas state laws.  The Individual Defendants were also deliberately indifferent to the known, predictable risk that Plaintiff would suffer pain, serious bodily harm and potentially even death.  The Individual Defendants' deliberate indifference to these risks deprived Plaintiff of his rights to bodily integrity and safety in violation of the Eighth Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution.

95. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe pain, and serious and permanent injuries, and is entitled to compensatory and punitive damages against Defendants.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983—Violation of Mr. Broadnax's Right to Substantive Due Process Against Defendant CMC**

96. Plaintiff repeats and realleges as is fully set forth herein the allegations contained in the foregoing paragraphs.

97. Defendant CMC's written contractual obligations under the Contract were facially unconstitutional and encouraged deprivations of the right to be free from cruel and unusual punishment and the right to medical care.

98. Defendant CMC's written contractual obligations (i) encourage Defendant CMC's employees to resolve substantial and legitimate incarcerated person grievances in favor of its employees or prison officials rather than incarcerated persons, otherwise Defendant CMC's employees would be subject to disciplinary action or penalties; and (ii) allow for Defendant CMC's employees to deliberately ignore or dismiss one out of every five incarcerated persons' sick call slips without any penalty to employees or recourse for the incarcerated person.

99. Defendant CMC's written contractual obligations thus encourage the widespread deprivation of incarcerated persons' Eighth Amendment rights, thereby resulting in cruel and unusual punishment of such persons.

100. Therefore, Defendant CMC's written contractual obligations advanced and encouraged actions that are directly in defiance of well-established law.

101. A municipality's written policies that ignore well-settled interpretations of constitutional rights are facially unconstitutional. *See Monell* v. *Dep't of Social Servs.*, 436 U.S. 658 (1978). Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation would most likely occur. *Covington* v. *City of Madisonville, Tex.*, 812 Fed. App'x 219, 225 (5th Cir. 2020). In addition, a written policy usually exists in the form of "written policy statements, ordinances, or regulations" such as Defendant CMC's contractual obligations. *Id.*

102. Defendants Elliott, Fernandez, Julye, Reilley, and Hoogendorn acted and relied on Defendant CMC's facially unconstitutional written contractual obligations throughout

21

their denial of medical care, delay of appropriate medical testing, and delay of emergency medical treatment for Mr. Broadnax.

103.     As a result, Defendant CMC's facially unconstitutional written contractual obligations were a moving force behind the deprivations of Mr. Broadnax's constitutional rights.

104.     As a direct and proximate result of Defendant CMC's unconstitutional contractual obligations, Plaintiff suffered severe pain and serious and permanent injuries, and is entitled to compensatory and punitive damages against Defendants.

## THIRD CLAIM FOR RELIEF

### Negligence
### Against All Individual Defendants

105.     Plaintiff repeats and realleges as is fully set forth herein the allegations contained in the foregoing paragraphs.

106.     Defendants owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Plaintiff or to those in a like situation would probably result from the foregoing conduct.

107.     Despite their knowledge that Plaintiff needed urgent medical care and the potential that Plaintiff would suffer pain, serious bodily injury or even death, Defendants ignored his requests for medical treatment.

108.     The risk of harm to Plaintiff presented by Defendants' failure to treat him was foreseeable and unreasonable, and the Defendants had actual or constructive knowledge of the risk, yet failed to take reasonable steps to prevent further harm to him.

109.    These failures constituted a breach of Defendants' duty and proximately caused Plaintiff to suffer.

110.    As a direct and proximate result of the negligence detailed above, Plaintiff sustained the damages herein alleged.  Defendants are liable for all damages resulting from their negligent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Broadnax prays for a judgement against Defendants and requests as follows:

111.    Compensatory damages in an amount to be determined at trial for the physical and psychological pain and injuries sustained by Mr. Broadnax as a result of the events alleged herein.

112.    Punitive damages in an amount to be determined at trial.

113.    Reasonable attorneys' fees, together with the costs of this action.

114.    Such other relief as is just and proper.


Dated: August 22, 2024
New York, New York

Respectfully submitted,

By /s/ *Steven C. Herzog*
            Steven C. Herzog
            Pietro Signoracci (*pro hac vice* forthcoming)
            Julia Logue (*pro hac vice* forthcoming)

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

            1285 Avenue of the Americas
            New York, New York 10019
            (212) 373-3317

23

sherzog@paulweiss.com
psignoracci@paulweiss.com
jlogue@paulweiss.com

***Counsel for Plaintiff***

**DAVID ADLER, P.C.**

David Adler
1415 North Loop West, Suite 905
Houston, TX 77008
(713) 666-7576
davidadler1@hotmail.com

***Texas Local Counsel for Plaintiff***